UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> GROQ, INC.,
>
>                          Plaintiff,
>
> -against-
>
> GROQ HEALTH, INC., and FLORENCE D.
> COMITE, M.D.,
>
>                          Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/16/2026__

1:23-cv-8325-MKV

**OPINION AND ORDER
DENYING MOTION FOR
SUMMARY JUDGMENT**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Groq, Inc. ("Groq") brings this trademark infringement action against Defendants Groq Health Inc. ("Groq Health") and Florence D. Comite, M.D.  Defendants seek summary judgment, arguing that, as a matter of law, there is no likelihood of confusion between the parties' marks.  Because Groq raises disputes of material fact as to virtually all of the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), and for all of the reasons set forth below, the motion for summary judgment is DENIED.

## I.    BACKGROUND[1]

### A. Facts

#### 1.  The Parties' Products

There is no dispute that Plaintiff Groq, Inc. ("Groq") was founded in 2016 by its Chief Executive Officer ("CEO"), Jonathan Ross, and a co-founder.  Ross Decl. ¶¶ 1, 7; *see* Def. Mem. at 5 (acknowledging that "Plaintiff Groq, Inc. was founded in 2016").  The parties agree that Groq

---

[1] The facts are taken from the evidence cited in the parties' Local Civil Rule 56.1 Statements, including the affidavits and declarations submitted in connection with the motion for summary judgment and the exhibits attached thereto [ECF Nos. 143 ("Def. 56.1"), 144 ("Mentzer Decl."), 144-6 ("Comite Dep."), 144-15 ("Tachner Dep."), 149, 153 ("Pl. Counter 56.1"), 154 ("Ross Decl."), 155–57 ("Martin Decl."), 155-3 ("Chorn Dep."), 158 ("Erdem Decl."); *see* ECF Nos. 142 ("Def. Mem."), 148, 152 ("Pl. Opp.")].

is worth billions of dollars and competes with large, established companies like Nvidia and Intel. Def. 56.1 ¶ 59; Pl. Counter 56.1 ¶¶ 59, 251; Ross Decl. ¶ 12.  However, the parties dispute the prices nature and focus of Groq's business.  *See, e.g.*, Def. 56.1 ¶¶ 40, 41, 51, 59, 60; Pl. Counter 56.1 ¶¶ 40, 41, 51, 59, 60, 220–49; Ross Decl. ¶¶ 15–22, 25–33.

The parties agree that Groq designs and makes microchips known as Language Processing Units ("LPUs") and other hardware that incorporates its LPUs.  Def. 56.1 ¶¶ 42, 43; Pl. Counter 56.1 ¶¶ 42, 43.  The parties also agree that Groq's LPUs and hardware are designed for use with artificial intelligence ("AI") models.  Def. 56.1 ¶ 46; Pl. Counter 56.1 ¶ 46.  For example, Groq makes a "GroqRack computer cluster," which features scores of "interconnected LPU chips," for use in data centers.  Def. 56.1 ¶ 44; Pl. Counter 56.1 ¶ 44.  However, Groq submits evidence that it offers a variety of goods and services beyond LPUs and hardware, including "software, cloud-based platforms," an "an application programming interface ('API')," which is related to Groq's cloud product and can be used to "to develop software and apps," a "chatbot, and consulting services to a range of consumers."  Pl. Counter 56.1 ¶¶ 51, 226, 228; Ross Decl. ¶¶ 15–21.  The parties do not genuinely dispute that Groq's cloud services are used on a mass scale, that some of Groq's customers "write software code for applications that use [Groq's] APIs," and and its chatbot is available for free to any individual who visits Groq's website.  *See* Def. 56.1 ¶¶ 62–65, 69, 133, 134; Pl. Counter 56.1 ¶¶ 62–65, 69, 133, 134.

Groq stresses that it has focused on providing "AI solutions to companies working in the healthcare industry or on healthcare-related issues."  Pl. Counter 56.1 ¶ 245; *see* Martin Decl., Ex. 36; Ross Decl. ¶ 10 ("Since our founding, Groq's mission has been to serve, partner with, and innovate key market sectors such as healthcare . . . .").  Groq cites its acquisition of a company called Maxeler Technologies ("Maxeler") in 2022, when "Maxeler was openly working on

2

developing AI-driven healthcare technologies." Ross Decl. ¶ 27. Groq has also "publicly pursued . . . Project Gnome, which leverages the power of LLMs to help medical professionals stay updated with gene-drug guidelines and enable anyone to process an entire genome into a human readable format in real-time." *Id.* ¶ 31 (emphasis omitted).

Defendants, on the other hand, maintain that Groq "is a chip company." Reply at 2 (citing Def. 56.1 ¶¶ 150–55). They stress that Groq "does not offer a healthcare app." *Id*; *see* Tachner Dep. at 194:10.

It is undisputed that Defendant Florence Comite, a physician, is the founder and Chief Executive Officer of Defendant Groq Health, Inc. ("Groq Health"). Def. 56.1 ¶¶ 1, 17; Pl. Counter 56.1 ¶¶ 1, 17. While the parties agree that Groq Health is a company devoted to offering a healthcare app, the parties dispute whether that app has already "launched" or remains in a "beta or pilot phase." Def. 56.1 ¶ 87; Pl. Counter 56.1 ¶ 430.

According to Defendants, the "Groq Health app is a mobile app that analyzes biomarkers like sleep, nutrition and exercise, alongside personal and family health history and a broad range of health data collected from blood draws, performance assessments, and wearable heath technology to create a comprehensive profile for each user." Def. 56.1 ¶ 23 (citing Mentzer Decl., Ex. 10 (Groq Health webpage)).[2] Defendants assert that the app "launched" in December 2021, citing Dr. Comite's testimony that December 2021 "was the first time that [she] had anybody as an actual patient on the Groq Health app." Def. 56.1 ¶ 87; Comite Dep. at 283:11–14. However, as Groq points out, Dr. Comite testified that the app has merely been in a "'beta' or 'pilot'" stage

---

[2] Groq objects that the evidence Defendants cite for the nature of the app, *i.e.*, images of the Groq Health website, is inadmissible hearsay, although Groq elsewhere submits precisely the same kind of evidence. *See* Pl. Counter 56.1 ¶ 23; Martin Decl. ¶ 69 ("Exhibit 68 is a true and correct copy of https://groq.com/."). The Court is not persuaded that Defendants' own website is inadmissible for purposes of establishing what product Defendants purport to offer using the contested mark. *See Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 633 (S.D.N.Y. 2012)

since 2021.  Comite Dep. at 245:2–4; *see* Pl. Counter 56.1 ¶ 430.  The app "currently is available" to the employees of Defendant's law firm, Fenwick & West, and of a company called "Hippocratic AI," as well as other, select individuals who have been approved by Dr. Comite.  Def. 56.1 ¶¶ 25, 26; Cromite Dep. at 284:6–7.[3]

The parties agree that Defendants plan to market the app broadly to the public.  *See* Def. 56.1 ¶ 28; Pl. Counter 56.1 ¶ 28; Cromite Dep. at 277:13–14  ("[E]ventually, there's no reason the whole world can't use it.").

## 2.  The Parties' Marks

There is no dispute that Groq owns two federal trademark registrations for GROQ [ECF Nos. 35-1, 35-2].  *See* Def. 56.1 ¶¶ 75–79; Pl. Counter 56.1 ¶ 210; Mentzer Decl., Ex 44; Martin Decl., Ex. 10.  The parties agree that Groq has used its name since at least 2017.  *See* Def. 56.1 ¶ 77; Pl. Counter 56.1 ¶ 201; Martin Decl. Exs. 31, 32, 41, 63.  There is also no dispute that Groq owns the mark GROQCLOUD and has filed applications for a number of other GROQ-formative marks.  *See* Def. 56.1 ¶ 81; Pl. Counter 56.1 ¶ 211.  In particular, there is no genuine dispute that Groq filed an intent-to-use trademark application for GROQHEALTH in 2022.  Pl. Counter 56.1 ¶¶ 345, 346; Martin Decl., Ex. 11.

It is also undisputed that Dr. Comite originally named her company Quantiome, Inc. in or about 2015.  Def. 56.1 ¶ 19; Pl. Counter 56.1 ¶ 19; Comite Dep. at 36:5–10, 38:6–21.  However, the parties dispute when Dr. Comite renamed the company Groq Health.  *See* Def. 56.1 ¶¶ 18, 20; Pl. Counter 56.1 ¶¶ 18, 20.

---

[3] At her deposition, Dr. Comite testified that she had believed the app was available only through an invitation but that she had "learned indirectly" that it was "available" on the Google Play app store.  Comite Dep. at 109:3–110:24. Based on her other testimony, it appears that members of the public may be able to "sign[] up" for the app through the Google Play store but cannot actually receive any services.  *Id.* at 111:11; *see id.* at 108:2–15, 109:23–110:3.

Defendants contend that Dr. Comite renamed the company in or about September 2020. Def. 56.1 ¶ 20 ("Dr. Comite renamed Quantiome, Inc. as 'Groq Health' in or around September **2020**.") (emphasis added) (citing Mentzer Decl., Ex. 9).    However, in their 56.1 Statement, Defendants cite in support of this contention only a letter, dated "October 20, **2022**," addressed to the Internal Revenue Service and signed by Dr. Comite, stating that Quantiome, Inc. "changed its legal name on June 15, **2022** to Groq Health, Inc."  Mentzer Decl., Ex. 9 (emphases altered).  As Groq points out in its Counterstatment, Dr. Comite testified at her deposition that she "c[a]me up with the name 'Groq Health'" over Labor Day weekend in September 2020.  Pl. Counter 56.1 ¶ 20 (citing Comite Dep. at 57:24–58:6); *see also* Comite Dep. at. 95:8–16.   Nevertheless, Groq stresses, there is evidence that Quantiome, Inc. did nothing to change its legal name until 2022. *See* Pl. Counter 56.1 ¶ 20; Martin Decl. ¶¶ 120–23.

The parties also dispute why Dr. Comite selected the name Groq Health.  According to Defendants, Dr. Comite has "a personal connection with the name."  Def. 56.1 ¶ 29.  Defendants rely on Dr. Comite's testimony that "grok" has been her "favorite word" since childhood.  Comite Dep. at 57:16–17; *id.* at 83:3–4 ("the word 'grok,' my favorite word in the whole world").  Dr. Comite testified that the word grok comes from her "favorite book," *Stranger in a Strange Land*, and she understands grok to mean "understand something intuitively and with compassion."  *Id*. at 240:13–18; *see* Def. 56.1 ¶ 34.

Defendants assert that Dr. Comite selected "Groq" with a "q," instead of using the ordinary spelling of her very favorite word, to "maintain continuity with the earlier name of her company, Quantiome."  Def. 56.1 ¶ 36 (citing Comite Dep. at 82:14–83:9, 238:4–242:8).  Yet, during the testimony that defense counsel cites, Dr. Comite said nothing about maintaining continuity with the earlier name.  *See* Comite Dep. at 82:14–83:9, 238:4–242:8.  Rather, Dr. Comite testified that

she "wanted 'Grok' with a K" but "gave up on that version" when a search in or about September 2020 revealed that there was a "medical or dental company" named Grok Health and the web domain for that name "was not available." *Id.* at 84:9–22, 308:21–23. Dr. Comite was, however, able to purchase "GroqHealth.com" and "related" domain names, "some . . . with a 'Q' and some with the 'K.'" *Id.* at 61:2–5; *see id.* at 60:13–17.

Dr. Comite further testified that, when she searched domain names, "[t]here were a lot of 'Groqs' out there." Comite Dep. at 61:10–11; *see id.* at 65:12–66:6 (testifying that she learned "there were a lot of 'Groqs' out there" by trying various "forms" to "see what was available"). Plaintiff offers evidence of Dr. Comite representing that she was unsure whether Groq.com (which has been owned by Plaintiff's CEO, Jonathan Ross, since 2014), was available when she searched and purchased various domain names. *See* Martin Decl. ¶ 86, Ex. 85 (time stamp 5:00–5:20); Ross Decl. ¶ 8. Dr. Comite testified at her deposition that she never "typed 'Groq' . . . into Google" because she was too busy. Comite Dep. at 370:10–16. According to Dr. Comite, she "didn't pay attention" to the other companies "once [she] knew [she] could get the name" Groq Health. *Id.* at 61:11–13. Dr. Comite also testified that she "wanted to use the 'Q'" because "it looked better balanced" with the "G" and she "thought it was cool." *Id.* at 239:19–23.

Groq cites Dr. Comite's own testimony about the domain name searches she performed and offers other evidence that, Groq argues, supports the inference that Dr. Comite knew of Groq before she changed the name of her company to Groq Health. *See* Pl. Counter 56.1 ¶¶ 402; 404; *see* Comite Dep. at 61:10–11, 397:8–398:17. Groq submits evidence that, from 2019 to 2024, Defendants' law firm, Fenwick & West, maintained offices in the same office building as Groq. Ross Decl. ¶ 51; Ross Decl., Ex. 27. Indeed, Ross attests to his "understanding" that not only defense counsel but also Defendants themselves "maintained offices in this same building" during

6

the relevant period. Ross Decl. ¶ 54. Groq submits evidence that its "signage" was clearly visible by the elevator in the lobby of the building. Ross Decl., Ex. 27.[4] Groq also submits evidence that it has been the subject of more than 100 news articles, has been referenced in hundreds of other articles, and has spent millions of dollars on advertising. *See* Pl. Counter 56.1 ¶¶ 263, 264; Martin Decl., Ex. 38; Ross Decl. ¶ 26; *id.*, Ex. 6; Tachner Dep. at 177:7–181:4.

Groq also cites Dr. Comite's conflicting testimony about when she first learned of Groq. *See* Pl. Counter 56.1 ¶¶ 39, 403–404. Specifically, during her deposition, Dr. Comite twice volunteered, in response to unrelated questions, that she "first" became "aware of Groq, Inc." when it sent Defendants "a cease and desist letter" in June 2022. Comite Dep. at 128:8–11; *id.* at 203:3–4 ("I never even heard of your company until we got a cease and desist letter."). However, later in the same deposition, Dr. Comite admitted that, in December 2020, her attorneys conducted a "[trademark] clearance search related to the named Groq Health" and "disclose[d] the existence of [Plaintiff] Groq Inc." to Dr. Comite. *Id.* at 397:8–398:17.

### 3. Groq's Enforcement of its Rights in the GROQ Mark

It is undisputed that Groq sent Defendants a cease-and-desist letter in June 2022. Def. 56.1 ¶ 88; Pl. Counter 56.1 ¶ 88. The parties dispute the extent of Groq's enforcement actions against other entities. *See* Def. 56.1 ¶¶ 72, 73; Pl. Counter 56.1 ¶¶ 72, 73, 278–309.

### B. Procedural History

Groq initiated this lawsuit against Defendants in September 2023 [ECF No. 1 ("Compl.")].

---

[4]



Ross Decl., Ex. 27 (image cropped).

Groq asserts claims for: (1) trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, Compl. ¶ 48–55 ("Count 1"); (2) false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), *id.* ¶¶ 56–61 ("Count 2"); (3) "trademark infringement under New York common law," *id.* ¶¶ 62–64 ("Count 3"); (4) injury to business reputation and dilution in violation of New York General Business Law § 360-1, *id.* ¶¶ 65–70 ("Count 4"); and (5) misappropriation and unfair competition under New York common law," *id.* ¶¶ 71–75 ("Count 5").

Defendants filed an answer which raised affirmative defenses and asserted counterclaims [ECF No. 23].  Thereafter, Defendants filed their First Amended Answer and Counterclaims [ECF No. 28 at 1–10 ("Ans."); ECF No. 28 at 10–27 ("Counterclaims")].[5]  In that pleading, Defendants asserted three counterclaims for declaratory judgments that: (1) Defendants have not infringed the trademarks that Groq owns, *see* Counterclaims ¶¶ 39–44; (2) Groq has no *bona fide* intent to use the mark GROQHEALTH, for which Groq has applied for a trademark (the "Application"), and, therefore, the USPTO must "refuse registration" or Groq must "abandon" the Application, Counterclaims ¶¶ 55, 56; *see id.* ¶¶ 45–58; and (3) "[Groq's] pending [A]pplication to register GROQHEALTH should be refused," Counterclaims ¶ 76; *see id.* ¶¶ 59–80.  Defendants also asserted a number of affirmative defenses, including that Plaintiff's claims against Defendants "are barred" because, Defendants alleged, Groq "lacked a *bona fide* intent to use GROQHEALTH" when it filed the Application.  Ans. at 8.

Groq thereafter moved to dismiss the Second and Third Counterclaims and to strike the aforementioned Affirmative Defense, all of which concerned the Application for GROQHEALTH [ECF Nos. 34, 35, 36 40,].  Defendants opposed the motion to dismiss and to strike [ECF Nos. 38,

---

[5] The Court cites "Ans." and "Counterclaims" separately because Defendants restart the numbering of the paragraphs.

39].  The Court granted the motion to dismiss the counterclaims, ruling that, under the plain text of the Lanham Act, the U.S. Patent and Trademark Office, not a district court, must adjudicate a pending trademark application in the first instance [ECF No. 71].  The Court denied the motion to strike Defendants' affirmative defense, ruling that, in litigating the infringement claims, Defendants were entitled to press their arguments that Groq has no *bona fide* intention of using GROQHEALTH or otherwise engaging in healthcare applications [ECF No. 71].  After the Court ruled, Defendants voluntarily dismissed their sole remaining counterclaim for noninfringement [ECF No. 81].

Thereafter, the parties completed discovery [*see* ECF No. 82], and Defendants filed a motion for summary judgment [ECF Nos. 91, 92, 93, 94, 95, 96, 97, 98].  Defendants argue that they are entitled to summary judgment because, Defendants contend, none of the eight factors identified in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) (the "*Polaroid* factors") weighs in favor of finding a likelihood of confusion.[6]  Def. Mem. at 12.  Groq filed an opposition to the motion for summary judgment [ECF No. 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 123, 124, 125, 126, 127].  It argues that, applying the *Polaroid* factors, a reasonable trier of fact could find a likelihood of confusion.  Pl. Opp. at 8.  Defendants filed a reply [ECF No. 128, 129, 131, 132].[7]

Both sides filed voluminous submissions, including memoranda of law, 56.1 Statements, declarations, deposition testimony, scores of exhibits, and expert reports.  At the request of both

---

[6] As set forth below, the *Polaroid* factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products; (4) evidence the senior user may "bridge the gap" between the markets; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.  *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)).

[7] Groq requested leave to file a sur-reply, which request Defendants did not oppose, but which the Court denied [ECF Nos. 133, 134, 136].

9

sides, the Court temporarily granted the parties leave to redact and seal numerous filings "to protect confidential business information," but, the Court warned: "the parties are on notice that the Court may determine that it is appropriate to unseal information if its pertinent to the Court's decision on summary judgment" [ECF No. 105].  Upon reviewing the submissions, the Court concluded that both sides' redactions and sealing were grossly overbroad.  For example, the parties had sealed Dr. Cromite's entire deposition, and redacted all references to her testimony, without offering any justification beyond the general need to protect business information.

As such, the Court advised the parties that it would not maintain under seal information "germane to the resolution of the motion for summary judgment" and directed them to re-file their submissions with more narrowly-tailored redactions [ECF No. 136; *see* ECF No. 137].  The parties re-filed their submissions [ECF Nos. 141–158].[8]  The Court has carefully reviewed the parties' new proposed redactions and sealing and finds that, with respect to most items, the parties' interest in protecting confidential business information outweighs the presumption of public access.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006).  However, where the parties still have not met their burden to overcome the presumption of access, and the Court will not maintain information under seal.[9]

---

[8] Throughout this Opinion, the Court has referenced the submissions with the more narrowly-tailored redactions.  *See supra* n.1.

[9] For example, Defendants have provided no justification for sealing the fact that one of their principal customers is defense counsel, which is relevant to this motion.  *See* Def. 56.1 ¶ 26.  Defense counsel's purchase of Defendants' health app service is not a privileged attorney-client communication, and Defendants have not bothered to offer the Court an explanation of the competitive harm they would suffer from the revelation of such information, which is their burden.  *See United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (the privilege protects only confidential communications for the purpose of obtaining or providing legal advice); *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997) (the party requesting sealing has the burden); *Lively v. Wayfarer Studios LLC*, 2026 WL 145483, at *5 (S.D.N.Y. Jan. 20, 2026) ("The fact that a document mentions the name of a third party does not in and of itself provide a compelling reason for the continued sealing of that document."); *Cohen v. Gerson Lehrman Grp., Inc.*, 2011 WL 4336679, at *2 (S.D.N.Y. Sept. 15, 2011) (sealing "clients' identities" is justified when they "have no bearing on th[e] case"); *Bacewicz v. Molecular Neuroimaging, LLC*, 2019 WL 10630387, at *3 (D. Conn. Nov. 6, 2019) (denying request to seal identity of customer where it was relevant to judicial decision).  Defendants likewise redact the name of their other principal customer, which appears to be an AI company, without offering a justification.

## II.    LEGAL STANDARD

A district court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "[T]he court must 'view the evidence in the light most favorable to the non-moving party and draw *all reasonable inferences in its favor*.'" *Williams v. New York City Hous. Auth.*, 61 F.4th 55, 72 (2d Cir. 2023) (emphasis in original) (quoting *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995)). Put another way, summary judgment is inappropriate unless "no reasonable jury could return a verdict for the nonmoving party." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 83 (2d Cir. 2020).

In addressing the standard for summary judgment in a trademark infringement case, the Second Circuit has held that "whether the plaintiff has shown a likelihood of confusion [is] a question of law." *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 109 (2d Cir. 2023) (quoting *Car-Freshner Corp. v. American Covers, LLC*, 980 F.3d 314, 326 (2d Cir. 2020). Specifically, the Second Circuit explained that "whether one of the *Polaroid* factors favors one party or another" and the balancing of the factors are "legal judgment[s]." *Id.* (quoting *Car-Freshner Corp.*, 980 F. 3d at 328). However, as in every other case, the district court does not have a "license to *make* factual findings at summary judgment beyond those very limited circumstances in which the uncontroverted evidence and the reasonable inferences . . . support only a single conclusion." *Id.* (emphasis in original) (quoting *Tiffany*, 971 F.3d at 85). Thus, where facts relevant to *Polaroid* factors are in dispute, the court cannot rule, as a matter of law, that such factors favor one party or another. *See Tiffany*, 971 F.3d at 85–86.

---

*See* Def. 56.1 ¶ 26.  In any event, this information is on the public docket in Plaintiff's re-filed submissions. *See* Pl. Counter 56.1 ¶ 26.

## III.    ANALYSIS

Defendants seek summary judgment on all of Groq's claims, arguing that Groq has not shown a likelihood of confusion.  *See* Def. Mem. at 10–25.  As set forth above, Groq asserts claims against Defendants for: trademark infringement under the Lanham Act (Count 1), false designation of origin under the Lanham Act (Count 2), trademark infringement under New York common law (Count 3), injury to business reputation and dilution under Section 360-l of the New York General Business Law (Count 4), and misappropriation and unfair competition under New York common law (Count 5).  Compl. ¶¶ 48–75.  All of Groq's claims under the Lanham Act and New York common law (*i.e.*, all claims except Count 4) require showing that Defendants' use of the Groq Health mark is "likely to cause consumer confusion as to the origin or association of the goods or services" based on the *Polaroid* factors.  *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 136 (2d Cir. 2023) (analyzing Lanham Act trademark infringement using the *Polaroid* factors); *see Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir. 1985) (the "ultimate inquiry" for false designation of origin is likelihood of confusion using the *Polaroid* factors); *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982) (same for common law trademark infringement); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995) (same for common law unfair competition); *Brit. Columbia Lottery Corp. v. Ma*, 2024 WL 4265654, at *3 (S.D.N.Y. Sept. 23, 2024) (collecting cases).[10]

Specifically, a plaintiff alleging trademark infringement under the Lanham Act must demonstrate that, first, "it has a valid mark that is entitled to protection" and, second, the

---

[10] There is a six-factor test for violation of New York General Business Law § 360-1: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *New York Stock Exch., Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002).  Defendants offer no argument for why they are entitled to summary judgment on this claim except for a passing assertion that it depends on "essentially 'the same'" analysis as the other claims.  Def. Mem. at 10 (quoting *Girl Scouts of the United States of America v. Boy Scouts of America*, 597 F. Supp. 3d 581, 604 (S.D.N.Y. 2022)).  Defendants' failure to argue this point alone is sufficient reason to deny

defendant's "actions are likely to cause confusion with [that] mark."  *Tiffany*, 971 F.3d at 84 (quoting *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)).  The first element is not in dispute.[11]  To show a likelihood of confusion, the plaintiff does not necessarily need to show that "consumers would believe that the defendant's goods or services are from the same source as those of the plaintiff."  *Id.* (quoting *The Sports Auth.*, 89 F.3d at 960). Rather, a defendant may be liable for trademark infringement if there is a likelihood of confusion as to any "*affiliation*, *connection*, or *association*" between the defendant and the trademark owner. *Id.* (emphasis added) (quoting 15 U.S.C. § 1125(a)(1)(A)); *see Int'l Info. Sys. Sec. Certification Consortium, Inc.*, 823 F.3d at 161–62.

To evaluate whether there is a likelihood of confusion, courts in this Circuit look to the eight *Polaroid* factors: "(1) the strength of the trademark; (2) the degree of similarity between the plaintiff's mark and the defendant's allegedly imitative use; (3) the proximity of the products and their competitiveness with each other; (4) the likelihood that the plaintiff will 'bridge the gap' by developing a product for sale in the defendant's market; (5) evidence of actual consumer confusion; (6) evidence that the defendant adopted the imitative term in bad faith; (7) the respective quality of the products; and (8) the sophistication of the relevant population of consumers." *Tiffany*, 971 F.3d at 84–85 (quoting *Polaroid*, 287 F.2d at 495).  Courts do not tally up the factors and rule that "the party with the greatest number of factors weighing in its favor wins."  *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000).  "Rather, a court should focus on the ultimate question of whether consumers are likely to be confused."  *Id.*

---

summary judgment.  *See Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009) ("Merely mentioning" an issue "is not enough; 'issues not sufficiently argued are in general deemed waived.'") (alteration adopted) (quoting *Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996)).

[11] There is no dispute that Groq owns two federal trademark registrations for GROQ [ECF Nos. 35-1, 35-2].  *See* Def. 56.1 ¶¶ 75–79; Pl. Counter 56.1 ¶ 210; Mentzer Decl., Ex 44; Martin Decl., Ex. 10.  As such, the parties focus entirely on likelihood of confusion.  *See* Def. Mem. at 10–25; Pl. Opp. at 7–25; Reply at 2–10.

It bears repeating, however, that, on a motion for summary judgment, a judge may not simply "ask himself . . . whether he thinks" consumers are likely to be confused.  *The Sports Auth.*, 89 F.3d at 960 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Instead, the question on summary judgment is whether, viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in its favor, *any* reasonable trier of fact could find a likelihood of confusion.  *Id.*  Here, Defendants essentially argue that Groq "sells AI microchips and hardware and AI cloud services" while "Defendants offer a health mobile app," and this lack of proximity tips many other *Polaroid* factors in Defendants' favor.  Def. MSJ at 12; *see id.* at 15, 22–23.  However, as explained below, Groq raises material disputes with respect to virtually every factor.  As such, the Court cannot rule as a matter of law that there is no likelihood of confusion. *See Tiffany*, 971 F.3d at 83; *Souza*, 68 F.4th at 109.

### A.  Groq Raises Disputes of Fact as to Proximity and Bridging the Gap.

In evaluating the proximity of products, courts consider "whether and to what extent the two products compete with each other[,] . . . the nature of the products themselves[,] and the structure of the relevant market."  *Vans, Inc.*, 88 F.4th at 140 (internal citations and quotation marks omitted).  "'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."  *Reply All Corp. v. Gimlet Media*, LLC, 843 F. App'x 392, 397 (2d Cir. 2021) (quoting *Star Indus., Inc. v. Bacardi & Co*., 412 F.3d 373, 387 (2d Cir. 2005)).  Here, there clearly are disputes of fact material as to each of these factors.

To be sure, as both sides agree, Groq makes chips and hardware for use in AI models and data centers.  *See* Def. 56.1 ¶¶ 42, 43, 44, 46; Pl. Counter 56.1 ¶¶ 42, 43, 44, 46.  The Groq Health app is different from and does not compete with those products.  *See Vans, Inc.*, 88 F.4th at 140.

14

However, Groq submits evidence that it offers a variety of goods and services beyond chips and hardware. *See* Pl. Counter 56.1 ¶ 51; Ross Decl. ¶¶ 15–21. Indeed, Defendants agree that Groq has a business providing cloud services and that some number of "developers write software code for applications that use [Groq's] API[.]" Def. 56.1 ¶¶ 60–64, 133. Moreover, there is no dispute that Groq offers a chatbot on its website. Def. 56.1 ¶ 134; Pl. Counter 56.1 ¶ 134. However, the parties dispute the "nature" and "market" for the cloud services, API, and chatbot, *Vans, Inc.*, 88 F.4th at 140, as well as their relevance to this lawsuit. Furthermore, Groq submits evidence of its long-held intention to "serve" and "partner with" companies working in the healthcare industry or on healthcare-related technology. Ross Decl. ¶ 10.

In particular, Defendants stress that Groq does not make a healthcare app or, indeed, any apps. Def. Mem. at 7; Tachner Dep. at 194:10. Defendants contend that it is simply immaterial that "a third party" could use Groq's products "in connection with a health app." Def. Mem. at 13. That contention is incorrect. As an initial matter, by statute, the court must consider likelihood of confusion with respect to any "*affiliation*, *connection*, or *association*" with the trademark owner. 15 U.S.C. § 1125(a)(1)(A) (emphases added). In other words, it matters whether a consumer might be confused as to whether the Groq Health app runs on Groq's chips, hardware, cloud, or API. *See Int'l Info. Sys. Sec. Certification Consortium*, 823 F.3d at 161.

Furthermore, contrary to Defendants' assertion, the likelihood that Groq will provide its AI-focused technology to a company that makes a healthcare app is not mere speculation. *See* Def. Mem. at 13–14. Rather, Groq offers specific evidence that it has already acquired a company, Maxeler, that "was openly working on developing AI-driven healthcare technologies" when Groq acquired it. Ross Decl. ¶ 27. Groq also submits evidence that it has "publicly pursued . . . Project Gnome, which leverages the power of LLMs to help medical professionals stay updated with gene-

drug guidelines and enable anyone to process an entire genome into a human readable format in real-time." *Id.* ¶ 31 (emphasis omitted). As Defendants themselves stress, "[c]ompanies of every type," including healthcare companies, "have responded to the proliferation in smartphone use by developing and offering mobile apps." Def. Mem. at 13 n.2. Groq's public interest in healthcare and the ubiquity of apps preclude the Court from finding as a matter of law that average consumers would not perceive Groq as being likely to be affiliated with a healthcare app. *See Star Indus., Inc.*, 412 F.3d at 387; *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996) (holding that summary judgment was inappropriate where "it [was] surely plausible" that the trademark owner would enter the alleged infringer's market and there were questions of fact as to consumer's perceptions).

With respect to Groq's chatbot, Defendants insist that Groq "is not a chatbot company." Reply at 2. Defendant contend that the sole function of Groq's chatbot is "to showcase the speed and utility of [Groq's other] products." Def. 56.1 ¶ 136. Defendants stress that Groq "does not earn any revenue from its chatbot." Def. 56.1 ¶ 137 (citing Ross Dep. at 66:2–67:5). Groq, however, submits evidence that its "AI chatbot is used by countless individuals to research and query for information," which could include health questions. Ross Decl. ¶ 20. Defendants offer no authority for the proposition that a product must be a trademark owner's principal line of business, or must directly generate revenue for the trademark owner, for that product to be relevant to the likelihood of confusion analysis. On the contrary, the "the senior user of the mark is the entitled user and should not be confined within the present scope of its commerce by the risk of confusion that will result from a reasonably plausible expansion of its business." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 45 (2d Cir. 2016); *see Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004) (explaining that the bridging-the-gap "factor is designed

16

to protect" the trademark owner's interest in expanding its business).

Furthermore, Defendants attempt to dismiss as irrelevant their documented, current efforts to incorporate an AI chatbot into the Groq Health app "[a]s soon as possible."  Comite Dep. at 260:23; *see id.* at 259:2–260:23, 330:5–333:19.  Defendants assert that it is not "of any significance that Defendants' Groq Health mobile app may in the future incorporate AI features" because AI is becoming "pervasive across all industries."  Def. Mem. at 14.  As an initial matter, this assertion, which suggests that Defendants' use of AI is speculative, is misleading.  Dr. Comite testified at her deposition that a "couple dozen" users already have access to a "test pilot" version of the AI model.  Comite Dep. at 332:25–333:19.  She further testified that the "integration" of AI into the Groq Health app is "[c]ritical" to Defendants' business plan, and she "plan[s] to widely promote Groq Health's use of AI."  *Id*. at 330:14–331:2.  In light of this testimony, a reasonable trier of fact could find that consumers are likely to be confused about whether Groq Health is affiliated with the AI-solutions company Groq.  *See Tiffany & Co.*, 971 F.3d at 83.

For these reasons, and reasons elaborated and supported in Groq's submissions, the Court rejects Defendants' argument that the proximity and bridging-the-gap factors of the *Polaroid* test weigh in Defendants' favor as a matter of law.

**B.  The Similarity Factor Does Not Weigh in Favor of Defendants**.

The key question in evaluating whether marks are similar is whether they create the same overall impression such that a consumer who has seen Plaintiff's mark would, upon later seeing Defendant's mark, be confused about the origin or association of the parties' products.  *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997).  Relying heavily on their unavailing arguments about the absence of proximity and evidence of bridging the gap, Defendants argue that the parties' marks are not similar in light of "the relevant real-world

17

commercial context" of their entirely different markets.  Def. Mem. at 15; *see id.* at 15–16. However, the Court has already rejected those arguments.

In many respects, "Groq" and "Groq Health" are similar.  The "dominant" word in both names is Groq.  *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 140 (2d Cir. 1999).  It is well established that if a junior user takes the entire mark of another and adds a generic, descriptive, or highly suggestive term, that generally is not sufficient to avoid confusion. *See Stone Lion Cap. Partners, L.P. v. Lion Cap. LLP*, 746 F.3d 1317, 1322 (Fed. Cir. 2014); 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:50 (4th ed.) (hereinafter, "McCarthy").  The Court is not prepared to rule, as a matter of law, that the addition of the word "Health" is sufficient to dispel any consumer confusion about whether Defendants are affiliated with Groq.  *See New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 335 (S.D.N.Y. 2010).

Moreover, "strong marks enjoy a wide latitude of legal protection," and, as such, where a mark is strong, there is less tolerance for similarities from competing marks.  *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 352 (Fed. Cir. 1992); *see id.* at 353.  As explained below, the parties strenuously dispute the strength of Groq's mark.

### C.  The Parties Dispute the Strength of Groq's Mark.

The strength of a mark depends on "its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public."  *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022) (quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131–32 (2d Cir. 1979)).  This factor "is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength."  *Id.*  The parties dispute both whether Groq is

18

inherently distinctive and whether it has lost its strength by coexisting with a supposedly crowded field of other Groq and Grok marks. *See* Def. Mem. at 19; Pl. Opp. at 9–12.

The inherent distinctiveness of a mark depends on whether it is "generic, descriptive, suggestive, arbitrary or fanciful." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995); *see RiseandShine Corp.*, 41 F.4th at 120–21. A generic mark, which is a common name that identifies a product (such as automobile or aspirin) receives no protection. *RiseandShine Corp.*, 41 F.4th at 120. Descriptive marks, which "tell something about a product, its qualities, ingredients or characteristics," are unprotectable unless they have acquired public recognition. *Id.* at 121 (alteration adopted) (quoting *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993)). Suggestive marks, which "suggest (rather than directly describe) the product . . . or its attributes," and may "sometimes requir[e] imagination to grasp," are protectable but "receive a narrower scope of protection" than arbitrary or fanciful marks. *Id.* Arbitrary or fanciful marks, which "make no logical reference to the product or service on which they are used, such as Google for a search engine," receive the greatest protection. *Id.*

Turning to public recognition, it is well established that "[e]xtensive third-party usage of a mark in related products generally weighs against a finding that a trademark is strong." *Id.* at 123. Put another way, "in a 'crowded' field of similar marks, each member of the crowd, [sic] is relatively 'weak' in its ability to prevent use by others in a crowd." *Id.* (alteration omitted) (quoting McCarthy § 11:85). Such dilution is made worse by a trademark owner's failure to enforce its rights against other uses. *See* McCarthy § 11:88. On the other hand, a plaintiff can demonstrate strength with evidence of the "length and exclusivity of the mark's use," advertising expenditures, sales success, unsolicited media coverage, and other facts. *Thompson Med. Co. v. Pfizer Inc.*, 753

19

F.2d 208, 217 (2d Cir. 1985).

Groq contends that its mark is fanciful or arbitrary because "GROQ is a made-up word 'without any dictionary meaning.'" Pl. Opp. at 9. Defendants, however, offer evidence that Groq's name is based on the "preexisting" word grok, which has a fixed definition ("to understand profoundly and intuitively"). *See* Def. 56.1 ¶¶ 70, 71; Ross Dep. at 99:16–100:23; Mentzer Decl., Ex. 32 (https://groq.com/about-us). Indeed, Groq does not genuinely dispute this evidence. *See* Pl. Counter 56.1 ¶¶ 70, 71. Nevertheless, even a mark with a dictionary definition may be arbitrary if the word does not suggest what the product is. *See Lexington Mgmt. Corp. v. Lexington Cap. Partners*, 10 F. Supp. 2d 271, 279 (S.D.N.Y. 1998). In all events, Groq is at worst suggestive and, therefore, is still inherently distinctive and entitled to protection. *See RiseandShine Corp.*, 41 F.4th at 121. However, this "is not the end of the inquiry." *Id.*

Defendants argue that Groq's mark is weak because of its "coexistence" with a "crowded" field of other Groq and Grok marks. Def. Mem. at 18. As an initial matter, this argument relies on the premise that "[t]here is no meaningful difference between 'GROQ' and 'GROK' marks," which Groq disputes. Def. 56.1 ¶¶ 123–27; Pl. Counter 56.1 ¶¶ 123–27. In any event, Defendants stress the existence of Elon Musk's xAI chatbot "Grok" and four other asserted users "of 'Groq' and 'Grok'" marks. *Id.* at 18–19. Defendants contend that Groq has failed to enforce its rights against these five other users. *See* Def. 56.1 ¶¶ 90–122.

Groq vigorously disputes that contention. Groq submits evidence that Groq has "contacted all but one of the five entities Groq Health cites" and "is in discussions with those four companies." Pl. Opp. at 11 (citing Pl. 56.1 ¶¶ 278–316); *see* Ross Decl. ¶¶ 34–47. Groq further submits evidence that the other entity, which it has not contacted, has filed only an intent-to-use application (meaning it has not yet used) for the mark Grok (not Groq) for products such as "plush toys,"

20

which are "clearly further afield from Groq's rights than Groq Health." Pl. Opp. at 11 n.5; *see* Pl. 56.1 ¶¶ 308–09; Mentzer Decl., Ex. 42. Groq also maintains that four or five other users "falls short of the 'ubiquitous' or 'considerable' use" required to weaken an inherently distinctive mark. *See In re I.AM.Symbolic, LLC*, 866 F.3d 1315, 1329 (Fed. Cir. 2017).

Moreover, with respect to the most famous "Grok," Musk's xAI chatbot, Defendants acknowledge that Groq has publicly posted on its website an "open letter" titled "Hey Elon, It's Time To Cease & De-grok." Def. 56.1 ¶ 120; Pl. Counter 56.1 ¶ 120. It is undisputed that, by the time xAI announced its intent to use the mark GROK in connection with its AI chatbot, Groq already had commence this lawsuit against Groq Health. Def. 56.1 ¶ 117. Pl. Counter 56.1 ¶ 117. Groq is not bound to litigate against every arguable infringer at the same time. *See Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1097 n.28 (S.D.N.Y. 1978) ("a trademark owner is not bound to take on more than one infringer at a time"), *aff'd*, 607 F.2d 995 (2d Cir. 1979). As such, there is a dispute of fact as to whether Groq has been "a vigilant defender of its rights." *Cuban Cigar Brands N.V.*, 457 F. Supp. at 1097.

Groq also submits other evidence of the strength of its mark. Specifically, Groq submits evidence that it has been the subject of more than 100 news articles, has been referenced in hundreds of other articles, and has spent millions of dollars on advertising. *See* Pl. Counter 56.1 ¶¶ 263, 264; Martin Decl., Ex. 38; Ross Decl. ¶ 26; *id.*, Ex. 6; Tachner Dep. at 177:7–181:4. In light of these facts, the Court rejects Defendants' argument that the strength factor of the *Polaroid* test weighs in favor of Defendants.

### D. Groq Offers Some Evidence of Actual Confusion.

It is well established that "actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a *likelihood* of

confusion as to source." *Savin Corp.*, 391 F.3d at 459 (emphasis added). Moreover, as the Second Circuit has explained, "if the junior mark has not yet appeared on the market, there has been no opportunity for confusion to manifest itself in the marketplace." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999), *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003); *see TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001) (where defendant "has not yet launched" its product, "the absence of evidence of actual confusion sheds no light whatever"). Here, the parties dispute whether the Groq Health app has already "launched," as Defendants contend, or remains in a "beta or pilot phase," as Groq submits. Def. 56.1 ¶ 87; Pl. Counter 56.1 ¶ 430.

Groq, nevertheless, offers some evidence bearing on the actual confusion factor. "Evidence of actual confusion may consist of anecdotal or survey evidence." *Capri Sun GmbH v. American Beverage Corp.*, 595 F. Supp. 3d 83, 170 (S.D.N.Y. 2022) (quoting *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y.), *aff'd sub nom. Paco Sport, Ltd. v Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000)). Groq submits a "LinkedIn post" in which Groq Health was mistakenly "tagged" instead of Groq. Mentzer Decl., Ex. 59. Groq also offers a report from its retained expert, Professor Dr. Tülin Erdem, based on two so-called "*Squirt*" surveys she conducted, in which, essentially, she exposed hundreds of survey respondents to various images (including images representing imaginary third parties) and thereafter asked respondents whether they believed Groq and Groq Health are separate entities, the same entity, or affiliated or connected entities, among other questions. *See* Erdem Decl., Ex. 1 at 9–41. Dr. Erdem found that, in each survey, slightly more than 20% of respondents were confused. *Id.* at 24, 42. Courts in this Circuit have treated surveys with lower rates of confusion as evidence of actual confusion. *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979); *Energybrands, Inc. v.*

22

*Beverage Mktg. USA, Inc.*, 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002).

Defendants dismiss the LinkedIn post on the ground that it does not reflect a consumer making a purchasing decision. Def. Mem. at 20. Defendants also attack Groq's expert evidence on the ground that "a *Squirt* survey requires that parties be proximate," which, Defendants contend, "they are not." Def. Mem. at 22. To be sure, neither the LinkedIn post, nor the survey evidence is direct evidence that real consumers experienced confusion. However, as one of Defendants' own authorities explains, such evidence is "nonetheless routinely categorized 'under the heading of "actual confusion."'" *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 n.99 (S.D.N.Y. 2010) (quoting 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:184)); *see* Def. Mem. at 22–23.

As noted above, Groq is not required to prove that real consumers were actually confused. *See Savin Corp.*, 391 F.3d at 459. Defendants' attack on Groq's expert evidence relies in part on its unavailing argument that the proximity factor weighs against finding a likelihood of confusion, which the Court has rejected in light of the parties' factual disputes. Moreover, while Defendants assert, in conclusory fashion, that the surveys "contain[] numerous methodological flaws," such an attack goes to the weight of the evidence, not its admissibility. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986). In other words, the probative value of the surveys is yet another dispute for trial. As Groq points out, Defendants hired their own experts, but they have not offered evidence that confusion is unlikely. *See* Martin Decl. ¶ 128; *Star Indus., Inc.*, 412 F.3d at 388.[12] Furthermore, even if the Court were to disregard Groq's evidence with

---

[12] Based on the Court's review of the docket, it appears that Defendants have not submitted expert reports in support of their motion for summary judgment. Groq submits evidence that one of the experts Defendants retained, Dr. Jacqueline Chorn, criticized Dr. Erdem for using a *Squirt* survey but, Groq submits, Dr. Chorn had previously opined that a *Squirt* survey was appropriate in similar circumstances when she was retained as an expert in a different case. *See* Pl. Counter 56.1 ¶¶ 370–71; Chorn Dep. at 45–47; Martin Decl., Ex. 4.

respect to actual confusion, as Defendants urge, Groq raises a factual dispute as to whether the Groq Health app has launched and, therefore, whether "the absence of evidence of actual confusion sheds [any] light whatever." *TCPIP Holding Co.*, 244 F.3d at 102.

Accordingly, the Court rejects Defendants' argument that the actual confusion prong of the *Polaroid* test weighs in favor of Defendants.

## E. The Parties Dispute Bad Faith.

The bad faith factor of the *Polaroid* test, also referred to as the good faith factor, "considers 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Arrow Fastener*, 59 F.3d at 397 (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991)). The junior user's "actual or constructive knowledge" of the senior user's mark "may signal bad faith." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987). On the other hand, "[f]ull knowledge of a prior use of a protected mark is not necessarily inconsistent with a finding of good faith, particularly where the alleged infringer is unsure as to the scope of the protection," *Cadbury Beverages*, 73 F.3d at 483. As the Second Circuit has repeatedly explained, "subjective issues such as good faith are singularly inappropriate for determination on summary judgment." *Tiffany & Co.*, 971 F.3d at 88 (quoting *Cadbury Beverages*, 73 F.3d at 483).

The parties dispute whether Defendants acted in bad faith. Defendants contend that Dr. Comite selected the name Groq Health in good faith, "for highly personal reasons," because grok is her favorite word, and spelling it with a "q," instead of a "k," created "continuity with the earlier name of her company, Quantiome." Def. 56.1 ¶¶ 29–37. Defendants further contend that Groq only "speculates" that Dr. Comite knew of Groq's mark before changing the name of her company from Quantiome to Groq Health. Def. Mem. at 23.

24

Contrary to Defendants' contention, Groq offers specific evidence to raise disputes about whether Dr. Comite acted in bad faith. For example, the parties dispute when Dr. Comite renamed her company. *See* Def. 56.1 ¶¶ 18, 20; Pl. Counter 56.1 ¶¶ 18, 20. This dispute is clearly material because it bears directly on whether Dr. Comite had prior knowledge of Groq's mark. In particular, Defendants contend that Dr. Comite renamed the company in or about September 2020. Def. 56.1 ¶ 20. Groq, however, cites evidence that Dr. Comite represented to the IRS that Quantiome, Inc. "changed its legal name on June 15, 2022 to Groq Health, Inc." Mentzer Decl., Ex. 9. Groq also submits evidence that, after initially denying that she had ever heard of Groq until it sent the cease-and-desist letter, Dr. Comite admitted that she had learned of Groq's mark in December 2020. Comite Dep. at at 397:8–398:17. As such, a trier of fact could find that Dr. Comite knew of Groq's mark before she changed the name of her company to Groq Health.

Groq further submits evidence that Dr. Comite had reason to know of Groq's mark even earlier than December 2020. Groq offers evidence that, beginning in 2019, Dr. Comite and her counsel maintained offices in the same building as Groq, where Groq's "signage" was displayed next to the elevator in the lobby. Ross Decl. ¶ 54; Ross Decl., Ex. 27. Groq further argues that it is reasonable to infer that Dr. Comite learned of Groq during her September 2020 search of numerous domain names involving variations of "groq" and "grok." *See* Comite Dep. at 61:10–11; *id.* at 65:12–66:6; *see Williams*, 61 F.4th at 72 (on summary judgment, a court must draw all reasonable inferences in favor of the non-moving party).

Moreover, although Dr. Comite's prior knowledge of Groq's mark does not necessarily require a finding of bad faith, a reasonable trier of fact could reject Defendants' evidence of good faith. For example, a reasonable trier of fact could reject Defendants' explanation for why Dr. Comite chose "Groq," instead of the ordinary spelling of her "favorite word in the whole world."

25

Comite Dep. at 83:3–4.  In particular, at some point during her deposition, Dr. Comite testified that she "wanted 'Grok' with a K" but "gave up on that version" when a search revealed that there was a "medical or dental company" named Grok Health and the web domain for that name "was not available."  *Id*. at 84:9–22, 308:21–23.  However, Dr. Comite also testified that she preferred "the 'Q'" because "it looked better balanced" with the "G," and she "thought it was cool."  *Id.* at 239:19–23.  In all events, Defendants fail to cite any testimony that supports their assertion, in their brief and 56.1 Statement, that Dr. Comite chose to use a "q" to maintain continuity with the earlier name of the company.  *See* Def. Mem. at 5; Def. 56.1 ¶ 36; Comite Dep. at 82:14–83:9, 238:4–242:8.  Similarly, it is for the trier of fact to determine whether it is credible that Dr. Comite never typed the word "groq" into Google because she was too busy.  Comite Dep. at 370:10–16; *see Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (credibility determinations are for the trier of fact, not for the judge on a motion for summary judgment).

In light of these issues of fact, the Court rejects Defendants' argument that the bad faith factor of the *Polaroid* test weighs in favor or Defendants as a matter of law.

### F.  Groq Raises a Dispute as to Quality.

The quality factor of the *Polaroid* test "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."  *Arrow Fastener*, 59 F.3d at 398.  Defendants assert that there is no evidence of any issue with the quality of the Groq Health app.  Def. Mem. at 25.  In response, Groq stresses that Dr. Comite testified that the Groq Health app was offered on the Google Play store without her knowledge when she believed the app was available by invitation only.  *See* Comite Dep. at 109:3–110:24; Pl. Opp. at 23.  Groq also questions whether Defendants properly "anonymize[]" patient data.  Pl. Opp. at 23.  Groq contends that these issues reflect a "lack of quality control,"

and, therefore, the app could harm its reputation. *Id.* (citing *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 456 (S.D.N.Y. 2017)).

As the movant, Defendants bear the burden of demonstrating, and not merely asserting, that there are no material disputes and that Defendants are entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(a). Since Defendants fall short of carrying that burden, the Court declines to rule that the quality factor of the *Polaroid* test weighs in favor of Defendants.

### G. Consumer Sophistication Does Not Weigh Decisively for Defendants.

The final *Polaroid* factor concerns whether there would be a likelihood of confusion given "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *The Sports Auth.*, 89 F.3d at 965 (alteration adopted) (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)). Defendants offer evidence that Groq's hardware is extremely expensive, and Defendants' current group of select, preapproved customers pay a high price for the Groq Health app. *See* Def. 56.1 ¶¶ 54, 57, 166. Defendants cite authority that courts assume consumers are more discriminating about purchasing high-priced products. *See Savin Corp.*, 391 F.3d at 461. However, this argument overlooks that Groq offers certain products (a "tier of access to its API" and its chatbot) for free. *See* Ross Decl. ¶¶ 18, 20. Moreover, Groq submits evidence that Defendants plan to offer the Groq Health app more widely at a much lower price. *See* Pl. Counter 56.1 ¶ 453; Martin Decl., Ex. 89.

As such, "there remain unanswered questions of fact regarding the level of sophistication" of the relevant consumer, which "cuts against summary judgment" for Defendants. *Brit. Columbia Lottery Corp.*, 2024 WL 4265654, at *7.

27

**H. Defendants Are Not Entitled to Summary Judgment.**

In light of the numerous factual disputes bearing on the various *Polaroid* factors, Defendants have not shown that there is no likelihood of confusion as a matter of law. *See Tiffany*, 971 F.3d at 83; *Souza*, 68 F.4th at 109. As such, Defendants are not entitled to summary judgment on Groq's claims under the Lanham Act and New York common law. As noted above, Defendants fail to offer any specific arguments that they are entitled summary judgment on Groq's claim for injury to business reputation and dilution claim under Section 360-1 of the New York General Business Law, which is sufficient reason to deny summary judgment on that claim. *See supra* n.10; *Gross*, 585 F.3d at 95. In any event, the test for violation of Section 360-1 overlaps with the *Polaroid* test, and many of the same disputes of fact preclude summary judgment on that claim. *See New York Stock Exch., Inc.*, 293 F.3d at 558.

Accordingly, this case will proceed to trial. Whatever the outcome of that trial, Dr. Comite will be free to offer her health app, whether to select individuals or the whole world. Comite Dep. at 277:14. What remains to be seen is whether Dr. Comite will be able to market the app using a variation on her "favorite word in the whole world." *Id.* at 83:4.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. The Clerk of Court respectfully is requested to terminate the motions pending at docket entries 91, 141, and 159. The Court will separately issue an order scheduling the trial.

**SO ORDERED.**

Date: **March 16, 2026**
      **New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**

28